May it please the court, my name is Janice Basil and I represented Bernard Morosco. I will cover in my argument the issues that I raised concerning 18 U.S.C. 371. It is our position as you know from my brief that 18 U.S.C. 371, conspiracy to defraud the United States, the second clause, is void for vagueness as a statute in that it does not provide fair notice of a crime and as applied in this case. In addition, the government failed to provide to prove the defendant's criminal intent as there was none. I am asking this court to take a second look at Section 371. I am well aware of the precedent in the history. I am well aware that I am swimming upstream. When I was first appointed to represent Mr. Morosco, I could not understand initially how his actions constituted a crime. There was no monetary scheme, no violation that I could find that called for a criminal penalty for its violation. I could not understand his potential culpability until I researched case law which interpreted Section 371. And it was only after I read cases like Hammersmith v. United States and Haas v. Hankel and similar cases that I learned that interfering with a federal agency in any way was a law school, which was there is no federal common law. And it was from this quandary that I researched the law, reviewed my client's actions, tried the case, and then wrote this brief. As you know, I filed a motion to dismiss, moved for judgment of acquittal, and proposed various jury instructions that essentially all revolved around the same issue. And that issue was that my client had no knowledge and no notice that what he did was a crime and that he had no criminal intent to break the law. My client knew the HUD regulations. He knew that inspectors should not provide a list of apartments ahead of time. He knew he was not an inspector. He knew the HUD website allowed the same list of supposedly randomly generated units to be generated again and again. He knew that no one in the history of HUD had ever been prosecuted for this. He knew that this interfered with the whole quality control regime. In a certain respect. He also, he certainly was not aware of the actions taken by the Chelsea Housing Inspectorate. In the respect that if they had the list ahead of time, they were going to go make repairs and it defeated the whole notion of a random selection of apartments. It did on the other hand, the random selection of apartments was approximately 10% of the overall score. The primary score for the housing authority, the primary evaluation was really the outside surfaces, the common areas, the building systems, and the financial reporting. The individual units represented 10%, I believe, it roughly was 10% of the overall score. In other words, the individual unit inspections and still receive a passing score. Isn't that a way of saying they cheated, but they cheated on only 10% of the test? Well, that was the government's position that they cheated. What I would say is that he certainly did not know about the SWAT teams and the various actions that the Chelsea Housing Authority took. He was not party to that and there was no evidence that he was. He did provide them with the list ahead of time. He also took other measures with the Chelsea Housing Authority, such as he would do 100% inspection of every single unit every year. Those inspections, his handwritten notes were submitted into evidence. In those he would note, this is going to be a demerit on a REAC inspection. This is going to be a demerit. He provided them with a preventive maintenance policy and he would walk with the inspector on the day of the tour. He did far more than that. I mean, the other actions that he took were designed to help the Chelsea Housing Authority score high on this inspection. I'm still trying to figure out what difference it makes that he only interfered with 10% versus 100%. Why is that relevant? I would say it was relevant, Your Honor, because if you look at the overall goal of the inspection, well, the overall goal of HUD is safe, sanitary, decent housing. The overall goal of the inspection is to ensure that that exists and that my client, while the 10% exists, he still worked to ensure that there was safe, sanitary, decent housing in the HUD buildings that comprise the Chelsea Housing Authority. But not the way HUD set up the inspection regime to work. It is not the way they set up to work, although I would say that HUD also set up the inspectors who inspected and they themselves would have their people inspect when they ran out of people who didn't bid for the project. And that's what sort of brought me to the issue that no one seemed to know that this was a crime. And there was testimony from three HUD employees, including a woman who had been there for 16 years and was clearly a staunch supporter of HUD and a well-respected employee. She had no idea this was a crime. And the same with the person who was an instructor and the same with the person who developed the IT or the computer program for HUD. But isn't it the case that the instances in which the government has to prove that there was a knowledge of criminality are rare and they are limited, I think, to cases in which the behavior in which it could readily be assumed to be either innocent or not. Here, I don't see how you fit into that category, because whatever may be the case about the terminology, i.e. defrauding or interfering, no one could reasonably have assumed that by, in the entire scheme of random samples, that this would have been a totally innocent act. I understand that, but also at the same time, because of my client's position where he had studied the HUD regulations, he did not believe it was a crime. He did not have a criminal intent. And regardless of... No, but the question is, is a criminal intent in the sense of a conscious knowledge of the criminality of the act an element that must be proved? And as I said, to the best of my recollection, those instances are rare in which one could reasonably consider the possibility that the act was totally innocent. And I don't see how your client could have assumed that making an end run around the random inspection scheme would have been entirely innocent. The government still has to prove mens rea, regardless of whether or not they have to prove... No question about it. Right. But the question is, as I understand your argument, must the mens rea include proof that the defendant understood that the particular act was classified as a crime? That is my position. I know that is your position, and what I keep trying to get at is where your client, I think, could not reasonably have been assumed that this was at least an appropriate or an innocent act within the scheme of HUD inspections. Why would we take the position that knowledge of criminality as such would be part of the mens rea? Because this involved... Unlike a criminal case where the unlawfulness is very clear, a typical violent crime, for example, this involved what was essentially the violation of a sub-regulation of a regulation. And when I looked through all of the HUD regulations and even regulations in other federal agencies, there are specific occasions where they say violation of this will be referred for criminal prosecution. And so it seemed to me that because this was such a small piece of a small regulation, the lack of notice existed. And especially where my client had been aware, and as was brought out in the testimony of the person who had done training, they had always referred to this as a variance. They had never referred to it as a crime. It had always been called a variance in the HUD terminology. And while what my client did, as Your Honor has said, does not appear to be innocent, at the same time, he did not see it as criminal. He did not have a criminal intent to do this. In part, he provided the list of the Chelsea Housing Authority with the idea that yes, they would work on their units, but he also expected and provided them with information that they would work on all of their units because he was involved intimately with every single unit and every single inspection every single year, not just the every other year of the REACT inspections. One problem I have with what you're saying, though, is it's a very, I know MNSREA is person an inspector that really didn't do what you're saying your client did to ensure that the other units had quality control. Yes. I mean, my client was not an inspector. He was a consultant, but I do understand that and I think that, yes. It did, however, as the case went on and as I reviewed my client's actions, he did not perceive, nor had anybody ever said, this is a criminal violation. But we keep coming back to that doesn't matter when the conduct is the type of conduct that a person in his position would know is wrongful conduct and any school child knows if you got a hold of the list that told you the 10 percent the teacher was going to focus on in your textbook, that would be wrong. But not a crime. But you don't need to know that it's a crime. There's no case law that you can point to that says where the conduct is the type of conduct that a person should know is not innocent and should know is wrongful. I mean, if someone got picked up tomorrow for going 31 miles an hour over the limit on the main turnpike, that's a crime and they wouldn't get off by saying, oh, I thought that was just a civil violation. And the same thing applies here, doesn't it? Yes, and the reason, and I would refer the court to the Alonis case, which dealt in part with the idea of both criminal intent and mens rea. If you look at Alonis, Mr. Alonis' threats on his Facebook, to me, were pretty violent and pretty horrific. But the fact that the government had not proved his intent in communicating that language as a threat required a reversal of his conviction. And it seemed to me that Mr. Alonis knew and well should have known that what he was putting on his Facebook was certainly violent and would, any ordinary person would see it as a viable threat. So I would refer the court to the Alonis case as well, which I cited in my brief on the issue of criminal intent here. And the other issue that I had asked the court, well not the other issue, but I had asked the court to take a look at 371 again in light of what has appeared to be a more careful look at language that courts have deemed to be void for vagueness. Both in Skilling, where the court narrowed down, what honest services fraud men, and even in Johnson, and those are by analogies, obviously they're not directly on point. And even Johnson, where after many years of litigation and much litigation in various circuits, the residual clause was deemed to be not careful enough, nor carefully drafted enough, to provide fair notice to people. One could say that an armed career criminal, knowing what their past was and knowing their criminal record, would certainly know that they had committed acts of violence or they had committed other acts that were deemed criminal. But yet the court removed the residual clause quite recently, feeling that the language was not specific enough. And if the court has no other questions, I will rest on my break. Thank you. May it please the court, Carrie Haberlin on behalf of James Fitzpatrick. I would like to address first and primarily the stumble out of the gate in this case, being the district court's disclosure of Mr. McLaughlin's guilty plea in this case. There doesn't seem to be much of a dispute that this disclosure was forbidden by settled precedent. The disclosure ran the risk of the jury convicting Mr. Fitzpatrick because he associated with Mr. McLaughlin, and it also violated his right to a determination of his guilt based upon the evidence subject to confrontation strictures. Mr. McLaughlin was not a witness in this case. There was no cross-examination regarding his motives for pleading guilty. Certainly he had a motive for pleading guilty given his other charges. There does seem to be a small dispute regarding how the jury would have understood this disclosure. And I submit that the jury plainly would have understood that by stating that Mr. McLaughlin had pleaded guilty in this case for himself, the jury would have understood that he had pleaded guilty to the conspiracy to defraud HUD as opposed to the salary conspiracy. I'd like to focus now on the issue of preservation, which jumps right out at you from the government's brief and my own. The government seems to concede that the disclosure by the district court was not invited by the defendant's request for questions to the jury, and that Mr. Marosco's objection was timely. I would submit that Mr. Marosco's objection, timely objection, satisfied the purpose of the razor wave rule as to Mr. Fitzpatrick. I understand that ordinarily defendants in joint trials must raise their own objections, but the purpose is to allow the district court ample opportunity to assess the prejudice as to each individual defendant. And in this case, Mr. Marosco's objection did give the judge that opportunity to assess the prejudice as to Mr. Fitzpatrick, given that the prejudice was identical. Both defendants were raising a lack of criminal intent at trial. Be that as it may, our case law is pretty strict in this area. It is very strict, but I would submit that evaluating the purpose of the razor wave rule as to prevent sandbagging and, again, to give the district court an opportunity to cure the prejudice, to assess the prejudice, that was satisfied here. The other element of this is that the district court resoundingly rejected Mr. Marosco's objection, declaring that it had been waived because it was not timely raised and declaring that it was not a problem because the newspapers had focused on Mr. McLaughlin's plea. It was a problem because the jurors who hadn't been reading the newspapers would have been totally unaware of Mr. McLaughlin's guilty plea. And as I think the government has conceded, the objection wasn't raised so late that nothing could be done to cure the prejudice, the potential prejudice. I think that even if this... But no one requested an instruction at that time. That's true. Nobody requested instruction then and also didn't request any sort of inquiry, but I think the judge was just, had rejected it so out of hand you couldn't expect counsel to raise a futile request. The judge had dismissed it. Sometimes you have to make objections knowing that the judge is going to overrule you. That's true, Your Honor, but I think we're elevating form over function if we're requiring certainly Mr. Fitzpatrick's attorney to stand up and raise an objection, an identical objection, after the judge has dismissed the already raised objection as essentially frivolous. Was there a... I'm sorry. Oh, go ahead. Was there an opportunity to discuss the judge's charge at the end of the trial evidence? There was. And was there a request made then? There was no request for a period of instruction then. I would suggest that the remedial measure that was required here was a specific inquiry of the seated jurors at least to determine that they could still partially decide Mr. Fitzpatrick's case and that it was defense counsel's prerogative not to ask the judge for a period of instruction at the end of the case. But the... I don't know. Maybe I should know the record better, but I don't know whether the judge at that point realized that he should have kept the thing out or have done something earlier on in the trial. But the judge did, as I recall from the briefs, take several opportunities to emphasize that the jurors were there to determine solely the guilt or innocence of these defendants. And that instruction, I suspect, would not have made a great deal of sense or, in fact, have been the subject of any need had there not been the earlier reference to the guilty plea. So in a situation in which sort of having been no objection in time having gone by, the judge was sort of between a rock and a hard place. Wasn't his instructions about the need to concentrate specifically on these individuals rather than anyone else a reasonable way to deal with the problem? First, I think those instructions really responded to the undertones in this case of a selective prosecution defense. The issue was raised by the government at the charge conference, and I think it was raised because the government was concerned about prejudice to the government as opposed to the defendants. And I was remiss in not quoting this language in my reply brief, but in response to the government raising a question for clarification as to whether the judge would specifically mention Mr. McLaughlin, the judge said, I do not think that it, a curative instruction regarding the disclosure, is necessary because of the way in which this case is unfolded. So even then the judge was not willing, seemingly, to give a curative instruction to the effect that the jury should disregard Mr. McLaughlin's guilty plea. And you took no exception to that conclusion of his? That's correct. Trial counsel took no objection to that conclusion. But, again, I believe there's case law in this circuit, and Lord help me if I can remember any names, but. I have the same problem. That says that trial counsel does not have to request a curative instruction if trial counsel believes that it will kick up some dirt that should be left settled. Oh, that's true. But that's not, as I understand it, the issue here. You would have liked a curative instruction at some point. You said a moment ago, well, you didn't ask for it because his ruling with respect to the other defendant made it clear that he wasn't going to give one. But you didn't ask for it. You didn't object, or trial counsel didn't object. Trial counsel didn't ask for the curative instruction at the time, at the point at which you just quoted the judge as saying, I don't think it's necessary in this case. No exception was taken to that conclusion of his. So it seems to me that there have been multiple opportunities to ask for something. And you basically, I think, are left with having to argue that on a plain error review, nothing could have cured this mistake. And I didn't understand your position to be that extreme. No, I think a specific inquiry of the jurors could have cured this problem. And I believe a specific inquiry is what this Court's cases require. Under Boylan and Bradshaw and Offred-Campos, the judge certainly has wide discretion to decide what kind of investigation must be mounted to a plausible allegation of jury taint. But at a minimum, there has to be an inquiry of the jurors as a group or individually. And I believe the case law is firm in that regard. And so I agree, Your Honor, if I'm standing here arguing that a curative instruction should have been given, then I'm subject to plain error. But my primary argument is that an inquiry should have been made as soon as the objection was raised. There was certainly time to do so. The jurors were still undergoing individual questioning. And, of course, at that point, too, the judge could have dismissed the panel and started fresh with one without such outside information. It still gets back to the problem of why didn't the instructions that the Court did give cure any problem. The jury instruction focused on these two defendants, and it further focused on the jury needing to decide based upon the evidence presented in the courtroom. Right. And this disclosure came from the most influential voice in the courtroom. During the selection process. During the selection process. And even in the judge's initial remarks to the jury after the disclosure of Mr. McLaughlin's guilty plea, he said, from this point on, you have to keep yourself immune from outside influences. The disclosure wasn't an outside influence, I submit. It was from the bench. And there was no affirmative instruction at any point during trial to disregard Mr. McLaughlin's guilty plea in determining Mr. Fitzpatrick's guilt or innocence. There were instructions to consider Mr. Morosco and Mr. Fitzpatrick separately. But as phrased, the judge emphasized that the defendants were to be considered individually and separately. But Mr. McLaughlin wasn't a defendant. And he was redacted from the indictment to so reflect. So how did it hurt him? Sorry? How did it hurt him? Let's assume we found the objection preserved or whatever. That's just your first hurdle. How do you show us that it wasn't harmless? Unfortunately, I can't quit the race after the first hurdle is what you're saying. The jury had the choice of crediting Mr. Fitzpatrick's testimony, the good faith belief that they could have this list, that it wasn't a problem, there was no regulation violating it, or crediting the government's evidence arguably suggestive of deceit or concealment. Mr. McLaughlin's guilty plea likely caused the jury to doubt Mr. Fitzpatrick's testimony of legitimate access. If Mr. McLaughlin did not believe that the Chelsea Housing Authority had legitimate access, then Mr. Fitzpatrick was either unreasonable to believe that or he was lying on the witness stand. Didn't Fitzpatrick say that he knew the list wasn't supposed to be generated until the day of the inspection? He did say he had knowledge of the random sampling procedure. He also said that he did not understand that to be a problem or a crime and that he had been assured that they had legitimate access. As we discussed earlier, whether he understood it to be a crime or not, how does that help? Well, I don't want to retrace our steps on the earlier argument, but in terms of a defense at trial played in front of a jury, I think the assertion that I didn't believe this was a crime, I thought I had legitimate access to this, I didn't have criminal intent, may play well. A couple of facts in my last few minutes here that I again was remiss in not highlighting. The district court found at sentencing or stated at sentencing that he did not believe that Mr. Fitzpatrick testified falsely. And I think that's important here in the harmlessness analysis. The government also did not seek an obstruction of justice enhancement, either as to his trial testimony or to his grand jury testimony, which at trial and now on appeal the government asserts was false. And finally, the jury manifested, I believe, its struggle with the issue of Mr. Fitzpatrick's criminal intent by asking for an expanded definition of willfulness in the context of this charge. As for the other issues in my brief, I'm prepared to rest on the briefing, unless the court has any questions. Thank you. Thank you. Good morning and may it please the court. Liza Collery on behalf of the United States. I'd like to begin with the argument that the district court prejudiced the jury by briefly alluding during the voir dire to the fact that a co-defendant who did not testify at trial had entered a guilty plea. Before I talk about the substance of that, I'd just like to emphasize that the standard of review with respect to Mr. Fitzpatrick is the plain error standard. No objection was raised by Mr. Fitzpatrick to the district court's remark at trial. And as the court itself has emphasized, not only was no contemporaneous objection made, Mr. Fitzpatrick did not join in when Mr. Marosco objected a few hours later, nor did he ever suggest any kind of need for a cure or request a limiting instruction, nor, interestingly, was the issue raised in post-trial motions. Mr. Fitzpatrick has suggested in his reply brief that he was somehow excused from the requirement to object because his co-defendant had raised the objection and the district court had overruled it. But in a case that he himself cites in his reply brief, it's Torebo Lugo, this court quoting from the Seventh Circuit said, counsel has a duty to object even at the risk of incurring the displeasure of the trial court to insist upon his objection. So the plain error standard of review does apply to this claim. Now let me talk about the merits of the claim. Counsel stated that there was never any kind of limiting instruction given, and that is not true. Well, you conceded in your brief that the court's statement was error. Yes, it was a mistake and it shouldn't have happened. But the fact that it was error is just the very beginning of the analysis. It was error, but it was corrected almost immediately. And I think in light of counsel's statements, it's very important that we actually look at what happened here, which is in Fitzpatrick's joint appendix at 280 and 81 and in the first day of the trial transcript at 58 to 59. The court is talking to the veneer about pretrial publicity. He wants to know, do you know anything about this case? And he says, have you heard anything about the case? And then he says, well, take that up after you've introduced yourself. And he says, let me sharpen this a bit more. One of the persons who the government alleges was involved in this case was the executive director of the Chelsea Housing Authority, a fellow by the name of Michael McLaughlin. Mr. McLaughlin has pleaded guilty in this case for himself. It received some publicity. The case has received some publicity. So the context is potentially prejudicial pretrial publicity. The court asks, do any of you recall hearing anything about the case with that in mind? And then he goes on to say two things. The next thing it says, let me say something about that. Number one, the fact that you have been exposed to some information about the case is not disabling necessarily, but it is something that I want to explore. So the court's making clear that the context here is prejudicial pretrial publicity and the possibility that jurors might have been exposed to it. And then he says, number two, you will understand that now that you are involved in the jury selection process, you are not supposed to be doing any reading outside investigation, going on the Internet, doing anything like that. And then here the court says, and this is critical, you have got to keep yourself immune from any outside influence at all. You have just got to put it out of your mind. But that's outside influence. This was inside influence. No, Your Honor, I think that what the court... The court just told him, did he ever tell them, don't pay any attention, don't give any weight to McLaughlin's plea? Yes. He told them that they had to put it out of their mind. Put anything they hear outside the courtroom, they had to put outside of their minds. Pretrial publicity. But the McLaughlin's plea was disclosed simply as an example of pretrial publicity. The court said, let's talk about what you've heard about this case. And then he says, let me sharpen this a bit more. Let me give you an example of the kind of pretrial publicity we've had in this case. He talks about McLaughlin's plea. He certainly could have handled the McLaughlin issue without acknowledging that there had been a guilty plea. The problem is that this is a conspiracy. So that now we have people on trial for conspiracy with the jury knowing that one of the alleged conspirators has already pled guilty. It's hard to figure out how the jury would unring that bell. That's not an outside influence. Well, the fact that it was disclosed in pretrial publicity is an outside influence. But I agree with you that it was disclosed to the jury. But they were then swiftly informed that they had to put it out of their head. Furthermore, in many, if not most, federal criminal cases, the jury is aware that a co-defendant has entered a guilty plea. That comes in in most trials because co-defendants frequently testify. And the fact of their guilty plea is brought before the jury. It's handled through a limiting instruction. It's handled with the judge telling the jury the purpose for which it's brought in is credibility. Here there was a limiting instruction, and the jury was told to put it out of their head altogether. But in those instances where the jury is told because a co-defendant is going to come into court to testify, that co-defendant is subject to cross-examination, McLaughlin didn't testify here. All the jury knew that one of the alleged co-conspirators had pled guilty and that these people were charged in conjunction with the scheme as a whole. That's true. But then the jury was repeatedly instructed first that it had to decide the case based solely on the evidence presented in court. I don't think that there's any reasonable argument that the jury would have thought this remark during voir dire was evidence in the case. The court made clear what the evidence consisted of. But you have the defendants here saying we didn't think this was a crime. And you have the judge having already told the jury that one of the folks has already acknowledged committing a crime. But that happens in many, if not most, federal cases. The jurors know that one of the co-defendants has acknowledged committing a crime. In this case, that information was provided. And they're subject to cross-examination. Usually in federal prosecutions, the co-defendants who have pled the judges are very specific that they don't tell the jury that information. If they're not coming in as a witness. Yes. Well, we concede that the information should not have been shared with the jury. We agree with that. But that's just the very beginning of the analysis. That's true. And the questions I'm directing to you, I'm trying to filter the whole prejudice piece in my mind, which is, as I said, how do you unring the bell when it's a conspiracy case? Well, often the guilty plea of a co-defendant comes in in a conspiracy case. But that's usually the option of defense counsel, isn't it? Yes. And the judge took away that option. Yes, but the jury was. . . And then the curative instruction was not exactly point on. It takes a sort of little bootstrap here to say this was a curative instruction, a real curative instruction would have basically told them why they shouldn't give any weight to McLaughlin having pleaded. But the court did that later in the general instructions. There were many general instructions telling the jury, first of all, I had to consider only the evidence in the case, and then that it had to decide the guilt or innocence of each defendant separately, independently of one another and independently of anyone else in the case. So the jury was aware of that requirement, in addition to having been told not to consider McLaughlin's plea. You have to put that out of your mind. They were also told that the guilt or innocence of each defendant was an independent inquiry. What do you think the defense argument on prejudice, as I understand it, is that in effect the defense was kind of asking the jury for almost a form of nullification to let them off because they didn't know it was a crime, even though the government wasn't required to show that it was a crime. Well, that's often what defense counsel do. They try to make their clients sympathetic to the jury so the jury gives them a break. And the argument seems to be here that the judge, in effect, told them there was a crime here by somebody. The judge indicated that a co-defendant had pled guilty in this case. Ordinarily that might mean the charge before the court. I don't think that's the case here because there was other misconduct by McLaughlin that was repeatedly placed before the jury. Marasco indicates in his brief that one of the major parts of Shum's testimony was the salary shenanigans. So I don't think that he pled guilty in this case necessarily meant the conspiracy. But the jury had been told not to consider that and to decide upon the guilt or innocence of each defendant individually based on the evidence that was presented in court. Let me just briefly discuss the harmless error part of this. Mr. Fitzpatrick says, well, somehow I thought we had legitimate access to this information. The evidence at trial overwhelmingly defeated that claim. It wasn't, as Mr. Fitzpatrick contends in his briefs, a few emails. There were many aspects of this case that showed that all of the defendants understood they could not have access to this and did what they could to keep it a secret. There was the effort to lie to everyone working in the Chelsea Housing Authority and tell them that Mr. Shum had somehow come up with a way to get access to this information. There was the effort to keep it from other people in the management of the Chelsea Housing Authority who were deemed unreliable. There was Mr. Fitzpatrick's somewhat panicky concern about not disclosing what he referred to as Mr. Marasco's exclamation point, exclamation point, exclamation point to other housing authorities. There was the fact that there were emails going back and forth talking about using non-Chelsea Housing Authority email to discuss this. And finally, there was Mr. Fitzpatrick's decision, really apropos of nothing, to lie about this during the grand jury. He brought it up during the grand jury and specifically lied and claimed that the groups that had been put together to repair the small number of units that were going to be inspected had repaired all of the units. So overall, there was overwhelming evidence that Mr. Fitzpatrick understood that what he was doing was improper, in violation of law. And Mr. Fitzpatrick in his brief suggested because he took the stand, there couldn't be overwhelming evidence of this, but that's simply not the case. Sometimes when the defendant takes the witness stand, he does more harm than good. And that was the case here because Mr. Fitzpatrick, although he claimed to think he had legitimate access, was simply unable to explain all of this behavior, all of this conduct that showed that he knew that this was improper. And we, in our brief, I won't go over it now, but in our brief we specifically list all of the things Mr. Fitzpatrick said on direct and cross-examination that were just implausible. And Mr. Fitzpatrick's reply brief doesn't take issue with any of that. These are specific aspects of his testimony that I think showed that the government's case was overwhelming. So even if one were to believe that the jury thought this was somehow evidence in the case, which is completely inconsistent with what the judge told them and with what the record showed, the error would have been harmless because the evidence was overwhelming with regard to Fitzpatrick's intent to deceive the government, which is the essence of this crime. I just want to move on very briefly to Marosco's arguments. I have little to say about them. Both defendants concede that the argument that 371, the conspiracy to defraud prong, is void for vagueness, is foreclosed by about 100 years of Supreme Court precedent. The court has considered this many times and has declined to overrule those precedents. So those arguments are simply not before the court today. This panel has no authority to overrule the Supreme Court precedent. I do want to correct the record on one very minor point. Mr. Marosco's counsel said a couple of times that he was not an inspector. He was, in fact, an inspector. And the fact that he was an inspector was what gave him access to this information. He had the number that he needed to get onto the computer system in the first place. He was not the inspector for this job, but the fact that he was an inspector is what allowed him to access HUD's computer system improperly, claiming that he was accessing it for work purposes and download this information. The other point that I wanted to make is about the Alanis case, the recent Supreme Court case. Counsel for Mr. Marosco suggested that that somehow supported his claim that we needed the kind of cheek, very high level of mens rea in this case where the defendant not only had to know that what he was doing was improper, which Mr. Marosco has acknowledged on numerous occasions he knew here, but that he knew it was a crime. Alanis has nothing to do with that issue. In Alanis, the question was whether the defendants, who had made what many reasonable people would interpret as threats, knew himself that they were threats. The Supreme Court found that you needed something more than mere negligence on his part as to the nature of the communications. But Alanis, in fact, reaffirmed the longstanding rule that is applied in the vast majority of cases, that a defendant need not know that his conduct is unlawful. So it does not support Marosco's claim, which is unsupported by any other authority, that the mens rea in this case was that he had to know it was a crime. He was given a jury instruction, which we believe gave him more than was his due, that he needed to know that he needed to have a bad purpose to disobey or disregard the law. But he did not even request a jury instruction, the jury instructed that he had to know it was a crime. And so that argument is not only forfeited, but it's not supported by any authority at all. If the court has no further questions, the government will rest. Thank you.